UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KELLY KIRKLAND, individually and on
behalf of all others similarly situated,

                                    Plaintiff,

                v.                                    5:15-CV-1184
                                                        (FJS/DEP)

SPEEDWAY LLC,

                                    Defendant.
_____

APPEARANCES                          OF COUNSEL

E. STEWART JONES HACKER              RYAN M. FINN, ESQ.
MURPHY, LLP                          DAVID I. IVERSEN, ESQ.
28 Second Street
Troy, New York 12180
Attorneys for Plaintiff

LITTLER MENDELSON PC                 JILL M. LOWELL, ESQ.
375 Woodcliff Drive, 2nd Floor       ANDREW J. VOSS, ESQ.
Fairpoint, New York 14450            HINNA M. UPAL, ESQ.
        - and -
80 South 8th Street, Suite 1300
Minneapolis, Minnesota 55402-2136
Attorneys for Defendant

SCULLIN, Senior Judge

MEMORANDUM-DECISION AND ORDER

I. INTRODUCTION

There are two motions pending before the Court.  First, Defendant moves to have the

Court enter judgment in favor of Plaintiff with regard to her Uniform Maintenance Pay, 12

N.Y.C.R.R. § 146-1.7(a), claim in conformance with Defendant's March 2, 2016 Rule 68 Offer of Judgment and subsequently to dismiss that claim as moot pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *See* Dkt. No. 18.  Defendant also moves for summary judgment pursuant Rule 56 of the Federal Rules of Civil Procedure with regard to Plaintiff's New York Human Rights Law ("NYHRL") and Uniform Maintenance Pay claims.  *See* Dkt. No. 38.

## II. BACKGROUND

On or about November 13, 2014, Defendant Speedway LLC hired Plaintiff Kelly Kirkland to work the overnight shift at its Hess-branded gas station in Ithaca, New York.  *See* Dkt. No. 38-1 at ¶¶ 15-16.  Her job consisted of running the register, maintaining the appearance of the store, and preparing food items.  *See id.* at ¶ 18.  Plaintiff was required to wear a clean uniform to work.  *See* Dkt. No. 43-3 at ¶ 25.  Part of the required uniform was a Hess-branded polo shirt.  When Plaintiff was hired, her supervisor, Brian Morgan, provided her with one polo shirt.  *See id.* at ¶ 2.1.  She received another polo shirt later in her employment.  *See* Dkt. No. 38-1 at ¶ 22.  Plaintiff worked a total of ten shifts although she was scheduled to work twelve.  *See id.* at ¶ 17; *see also* Dkt. No. 43-3 at ¶ 17.

Plaintiff worked with Joseph Leeks for three of these shifts.  *See* Dkt. No. 38-1 at ¶ 30.  Plaintiff knew Mr. Leeks before she was hired because she was a frequent customer of the gas station; and he was a friend of Plaintiff's then-boyfriend, who also worked with Mr. Leeks.  *See id.* at ¶¶ 27-29.  Plaintiff alleges that Mr. Leeks sexually harassed her during each of the shifts they worked together.

On the first shift, Plaintiff testified that Mr. Leeks told a co-worker that they were dating and at least once called her "hun."  *See* Dkt. No. 38-4, Pl's Depo. at 156, 161  Plaintiff also

testified that Mr. Leeks was "creepy," and he was constantly staring at her and making her feel uncomfortable.  *See* Pl's Depo. at 162-64.

On the second shift, Plaintiff alleges that Mr. Leeks constantly said to her, "How you doing, baby girl?  How are you, hun?  Can I give you a ride, baby girl?  Hun, what's the matter?  You doing okay, Hun?  Baby girl, what's the matter?"  *See id.* at 168.  Furthermore, Plaintiff testified that Mr. Leeks inappropriately touched her hand twice, *see id.* at 176, and that Mr. Leeks bumped into her on purpose, *see id.* at 180.  Finally, she testified that Mr. Leeks stared at her constantly.  *See id.* at 181 (stating that he looked like "a monster from the closet").

On the third shift, Plaintiff testified that Mr. Leeks constantly called her "baby girl." *See id.* at 186.  Further, Mr. Leeks placed both hands on Plaintiff's shoulders, and she froze in fear and told him not to do that.  *See id.* at 200.  In addition, she testified that he was constantly staring at her.  *See id.* at 203.  Moreover, she stated that, when she tried to hand Mr. Leeks money, he grabbed her hand.  *See id.* at 204.  Finally, she testified that he bumped into her again in the same manner as the previous shift.  *See id.* at 205.

On December 10, 2014, Plaintiff left a note asking her manager, Mr. Morgan, to call her.  Mr. Morgan called Plaintiff, and she described the preceding events to him.  *See* Pl's Depo. at 261.  Mr. Morgan told Plaintiff that he would no longer schedule her to work with Mr. Leeks and that he was going to forward her complaints to the human resources manager.

On December 13, 2014, Plaintiff went to pick-up her pay-check at the gas station.  Mr. Leeks was there and yelled Plaintiff's name several times and tried to get her attention.  *See id.* at 196.  Plaintiff ignored him and walked away and called Mr. Morgan after this incident.  *See id.* at 264.

During the time she worked for Defendant, Plaintiff also worked at Rite-Aid.  On December 14, 2014, Mr. Leeks approached Plaintiff while she was working at Rite-Aid. Plaintiff testified that Mr. Leeks asked her to cook for him, asked her to move away with him to Florida, rubbed her arm, and made her feel "completely terrified."  *See id.* at 216.  Eventually Plaintiff ran away from Mr. Leeks and complained to her Rite-Aid manager that she was "creeped out."  *See id.* at 229.  Plaintiff called Mr. Morgan after the Rite-Aid incident.

Plaintiff testified that she met with Defendant's human resources manager, Renee Schroll, on December 16, 2014, and told her that she was afraid of Mr. Leeks, upset that no one had told her that Mr. Leeks was a violent sex-offender,[1] and was uncomfortable working with him.  *See* Pl's Depo. at 258-59.  Plaintiff also gave Ms. Schroll a written statement.  *See* Dkt. No. 38-15. Ms. Schroll interviewed Mr. Leeks and a witness to the harassment and afterward concluded that Plaintiff's complaints were "not substantiated"; however, she also concluded that Plaintiff should not be scheduled to work with Mr. Leeks anymore.  *See* Dkt. No. 38-9, Schroll Dec., at ¶ 19.

Plaintiff was originally scheduled to work on the date of her interview with Ms. Schroll, December 16, 2014; however, she did not.  Thereafter, she was not placed on the schedule again. The parties dispute why she was never scheduled again.  Plaintiff claims it was retaliation for her complaints; Defendant, on the other hand, argues that Plaintiff neglected to provide Mr. Morgan with her availability.  In any event, Defendant deemed Plaintiff to have abandoned her job on January 31, 2015, due to a month and a half of inactivity.  *See id.* at ¶ 22.

Plaintiff commenced this action on September 3, 2015, by service of a Summons with Notice on the New York Secretary of State against Hess Retail Operations, Speedway LLC, and Hess Corporation (collectively "Defendants") in New York State Supreme Court, County of

---

[1] Mr. Leeks is a Level III Violent Sex Offender.  *See* Dkt. No. 43-1.

Tompkins.  Defendants subsequently removed the action to this District based on diversity of citizenship.  *See* Dkt. No. 1.  Subsequently, on March 2, 2016, the Court approved the parties' stipulation to dismiss Defendants Hess Corporation and Hess Retail from this case.  *See* Dkt. No. 16.

In her complaint, Plaintiff asserts two causes of action: (1) hostile work environment and retaliation in violation of NYHRL; and (2) an individual and putative class action claim to collect unpaid uniform maintenance pay for Defendant's breach of the requirements set forth in 12 N.Y.C.R.R. § 146-1.7(a).  *See generally* Dkt. No. 8.  Defendant moves to dismiss Plaintiff's Uniform Pay claim for lack of subject matter jurisdiction; or, alternatively, for summary judgment.  Defendant further moves for summary judgment on Plaintiff's NYHRL claims.

## III. DISCUSSION

**A.    Defendant's motion to dismiss Plaintiff's Uniform Maintenance Pay claim**

*1. Background*

Part 146 of the New York Minimum Wage Orders pertains to the hospitality industry, *i.e.,* restaurants and hotels.  The regulation broadly defines the term "restaurant" to include "any eating or drinking place that prepares and offers food or beverage for human consumption. . . ." 12 N.Y.C.R.R. § 146-3.1(b).  Defendant's gas station falls within the statutory definition, as it admits that part of Plaintiff's position was to prepare "pizza and breakfast sandwiches for a customer self-service food case."  *See* Dkt. No. 38-1 at ¶ 18.

As a part of the hospitality industry, Defendant must comply with the rules set forth in Part 146, including the Uniform Maintenance Pay provision, which provides that, "[w]here an employer does not maintain required uniforms for any employee, the employer shall pay the

employee, in addition to the employee's agreed rate of pay, uniform maintenance pay . . . based on the number of hours worked[.]"  12 N.Y.C.R.R. § 146-1.7(a).  In 2014, when Defendant employed Plaintiff, the uniform maintenance pay was $9.95 for each week an employee worked more than 30 hours and $4.75 for each week an employee worked up to 20 hours per week.  Moreover, the regulation defines "required uniform" as "clothing required to be worn while working at the request of an employer, or to comply with any federal, state, city or local law, rule, or regulation, except clothing that may be worn as part of an employee's ordinary wardrobe."  12 N.Y.C.R.R.   § 146-3.10(a).  The parties agree that the Hess-branded polo shirt is the only part of Plaintiff's daily wardrobe that qualifies as part of her required uniform.

Plaintiff generally alleges that Defendant provided "uniforms but did not pay to have the uniforms laundered nor did Defendant[] provide each employee with a sufficient number of uniforms . . . to avoid paying the statutory uniform maintenance fee."  *See* Dkt. No. 8 at ¶ 70.

As noted above, Defendant moves for the Court to enter judgment in favor of Plaintiff with regard to her Uniform Maintenance Pay claim in conformance with Defendant's March 2, 2016 Rule 68 Offer of Judgment and subsequently to dismiss that claim as moot pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.

### 2. Analysis

"It is well established that '[t]he Case or Controversy Clause of Article III, Section 2 of the United States Constitution limits the subject matter jurisdiction of the federal courts such that the "parties must continue to have a personal stake in the outcome of the lawsuit."'"  *Tanasi v. New Alliance Bank*, 786 F.3d 195, 198 (2d Cir. 2015) (quotation omitted).  "That is, '[w]hen the

issues in dispute between the parties are no longer live, a case becomes moot.'" *Id.* (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005)).

Rule 68 of the Federal Rules of Civil Procedure provides, in pertinent part, that "a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued." Fed. R. Civ. P. 68(a).  If, within 14 days after being served, the plaintiff accepts, "[t]he clerk must then enter judgment." *Id.*  On the other hand, "an unaccepted offer is considered withdrawn[.]" Fed. R. Civ. P. 68(b).  However, the consequence of declining an offer is that, if the plaintiff receives a less favorable judgement, it "must pay the costs incurred after the offer was made." Fed. R. Civ. P. 68(d).

In *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), the Supreme Court settled the "disagreement among the Courts of Appeals over whether an unaccepted offer can moot a plaintiff's claim, thereby depriving federal courts of Article III jurisdiction." *Id.* at 669 (citations omitted).  The Court expressly rejected the proposition "that an unaccepted settlement offer [under Rule 68] can moot a complaint." *Id.* at 671.  Rather, the Supreme Court ruled that, "'[w]hen a plaintiff rejects such an offer -- however good the terms -- her interest in the lawsuit remains just what it was before.  And so too does the court's ability to grant her relief.  An unaccepted settlement offer -- like any unaccepted contract offer -- is a legal nullity, with no operative effect.'" *Id.* at 670 (quoting [*Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1533 (2013) (Kagan, J., dissenting)]).

In reaching this decision, the Supreme Court emphasized that, after the offer of judgment had expired, the plaintiff's claim remained unsatisfied:

> [W]hen the settlement offer Campbell extended to Gomez expired, Gomez remained emptyhanded; his [Telephone Consumer Protection Act] complaint, which Campbell opposed on the merits, stood wholly unsatisfied.  Because Gomez's individual claim was not made moot by the expired settlement offer, that

> claim would retain vitality during the time involved in determining whether the
> case could proceed on behalf of a class.  While a class lacks independent status
> until certified, *see Sosna v. Iowa*, 419 U.S. 393, 399, 95 S. Ct. 553, 42 L. Ed. 2d
> 532 (1975), a would-be class representative with a live claim of her own must be
> accorded a fair opportunity to show that certification is warranted.

*Id.* at 672.

Importantly for the present purpose, however, the Court declined to "decide whether the result

would be different if a defendant deposit[ed] the full amount of the plaintiff's individual claim in

an account payable to the plaintiff, and the court then enter[ed] judgment for the plaintiff in that

amount." *Id.*

Defendant suggests that this case presents an opportunity for the Court to answer this

unresolved question.  In that regard, on March 7, 2016, Defendant served upon Plaintiff an offer

of judgment permitting her to (1) take judgment against Defendant as to her Uniform Pay claim;

(2) receive payment of one hundred sixty three dollars and fifty cents ($163.50) for any unpaid

Uniform Maintenance Pay; and (3) receive payment for Plaintiff's applicable attorney's fees and

costs.  *See* Dkt. No. 18-3.  Furthermore, on that same day, Defendant deposited $163.50 into its

attorney's escrow/trust account.  *See* Dkt. No. 18-1 at 6.  Defendant asserts that the funds are

payable to Plaintiff and "a check for the full $163.50 will be issued to Plaintiff upon Order of the

Court or request by Plaintiff or Plaintiff's counsel."  *See id*.  Plaintiff, however, rejected

Defendant's offer.

Defendant argues that, where the "'offer tenders complete relief, the court should . . .

enter judgment pursuant to the terms of that offer, with or *without* the plaintiff's consent.'"  *See*

*id*. (quoting *Hepler v. Abercrombie & Fitch Co.*, 607 F. App'x 91, 92 (2d Cir. 2015) (emphasis

added)).  Defendant relies on *Helper* for the proposition that "'a defendant may always end the

litigation by offering judgment for all the relief that is sought.'"  *See id.* (quoting *Helper*, 607 F.

App'x at 92).  Defendant also cites two cases in which the courts entered judgment against the defendants, rendering the cases moot, notwithstanding the existence of putative class complaints. *See id.* at 7 (citing *Franco v. Allied Interstate LLC*, No. 13-CV-4053, 2015 WL 7758534 (S.D.N.Y. Nov. 30, 2015); *Maximo v. 140 Green Laundromat*, No. 14 CIV. 6948, 2015 WL 4095248 (S.D.N.Y. July 7, 2015) (FLSA claim)).

Finally, Defendant argues that *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), does not compel an opposite result.  *See id*. at 9.  Defendant contends that the "linchpin" of *Campbell-Ewald* was "the failure of defendant to remit payment to plaintiff, which resulted in a live case and controversy because the unaccepted Rule 68 Offer was never effectuated."  *See id.* Here, in contrast, Defendant has placed the full amount of the offer in an escrow/trust account payable to Plaintiff.  *See id.*

The Second Circuit's recent decision in *Radha Geismann, M.D., P.C. v. ZocDoc, Inc.*, 850 F.3d 507 (2d Cir. 2017), forecloses Defendant's argument.  *ZocDoc* confirmed that, "'[w]hen a plaintiff rejects [a Rule 68] offer -- however good the terms -- her interest in the lawsuit remains just what it was before.  And so too does the court's ability to grant her relief.'"  *Id*. at 513 (quoting *Campbell-Ewald*, 136 S. Ct. at 670 (quoting *Genesis Healthcare*, 133 S. Ct. at 1533 (Kagan, J., dissenting))).  Furthermore, because Plaintiff declined the offer, it was considered "withdrawn."  Fed. R. Civ. P. 68(b).  As the Second Circuit stated, "a 'withdrawn' offer 'ha[s] no continuing efficacy.'"  *ZocDoc*, 850 F.3d at 512 (quoting [*Campbell-Ewald*,] 136 S. Ct. at 670).  Thus, the Court is powerless to enter judgment in Defendant's favor because the unaccepted Rule

68 offer is a legal nullity.[2]  *See id*.  Therefore, the Court denies Defendant's motion to dismiss

Plaintiff's Uniform Maintenance Pay Claim.

**B.        Motion for summary judgment**

   *1. Standard of review*

   A court must grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The movant for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion" and identifying which materials

"demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).  A fact is "material" if it "might affect the outcome of the suit under the

governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  If the movant meets this burden, the nonmoving party must "'"set forth specific facts

showing a genuine issue for trial."'"  *Id*. (quotation omitted).  "[I]n ruling on a motion for

summary judgment, the district court is not to weigh the evidence but is instead required to view

the evidence in the light most favorable to the party opposing summary judgment, to draw all

reasonable inferences in favor of that party, and to eschew credibility assessments[.]"  *Weyant v.*

*Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted).  However, the nonmoving party

---

[2] Furthermore, contrary to Defendant's suggestion, this case is not like the hypothetical posited in
*Campbell-Ewald* where "a defendant deposits the full amount of the plaintiff's individual claim
in an account payable to the plaintiff, and the court *then enters* judgment for the plaintiff in that
amount."  *Campbell-Ewald*, 136 S. Ct. at 672 (emphasis added).  Instead, the Court has not
entered a judgement, and *ZocDoc* clearly holds that the Court is powerless to do so after a Rule
68 offer is declined or expires.  *See ZocDoc*, 850 F.3d at 515 & n.8; *see also* Fed. R. Civ. P
68(b).

cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing [*Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (*per curiam*)]).

### 2. Plaintiff's Uniform Maintenance Pay claim

The parties' principal dispute regarding Plaintiff's Uniform Maintenance Pay claim concerns the applicability of the so-called "wash-and-wear" exception to the requirement that the employer remit uniform maintenance pay.  Under this exception,

> [a]n employer will not be required to pay the uniform maintenance costs, where required uniforms
>
> (1) are made of "wash and wear" materials;
>
> (2) may be routinely washed and dried with other personal garments;
>
> (3) do not require ironing, dry cleaning, daily washing, commercial laundering, or other special treatment; and
>
> (4) are furnished to the employee in sufficient number, or the employee is reimbursed by the employer for the purchase of a sufficient number of uniforms, consistent with the average number of days per week worked by the employee.

12 N.Y.C.R.R. § 146-1.7(b).

The parties do not dispute the existence of the first three requirements needed to evoke the wash-and-wear exception; rather, their disagreement centers on whether Defendant provided a sufficient number of uniforms "consistent with the average number of days per week worked by the employee."  *Id.*

Defendant, on the one hand, argues that Plaintiff received two polo shirts and worked a total of ten shifts in five weeks, averaging two shifts a week; thus, because two shirts matches the average number of days she worked per week, she is not entitled to uniform maintenance

pay.  *See* Dkt. No. 38-2.  Defendant relies on an email response from a New York Department of Labor "Supervising Investigator" to support its position.  *See id*. at 29-30 (citing Dkt. No. 38-8). Furthermore, Defendant contends that it had a practice of providing additional shirts to its employees as they needed them and that Plaintiff conceded that she was able to take extra shirts as needed.  *See id*. at 29.  Finally, Defendant posits that, because Plaintiff could wear the shirts more than once before washing, a "sufficient" number of shirts might be less than an equal number of shifts per week.  *See id.* at 29-30.

Plaintiff, on the other hand, argues that Defendant had to provide at least an equal number of shirts per shift/per week due to the messy nature of the food service work at the gas station.  *See* Dkt. No. 44 at 19.  Furthermore, Plaintiff contends that, although she eventually received a second shirt, she was only given one shirt when she was hired and that one shirt was undeniably insufficient in the first week because she worked four days, followed by three days in the next week.  *See id.* at 20.  Plaintiff asserts that, during the beginning of her employment, she had to launder her shirt several times per week.  *See id*.  Therefore, Plaintiff argues that Defendant has failed to meet its burden to show that it qualifies for the wash-and-wear exception. *See id.* at 21.

As a preliminary matter, the Court notes that the email guidance Defendant provided from a supervisor at the New York Department of Labor does not support its position.[3]  The opinion letter states as follows:

---

[3] Although typically "[a]n agency's interpretation of its own regulation is entitled to deference unless it is unreasonable or irrational," *Seenaraine v. Securitas Sec. Servs. USA, Inc.*, 37 A.D.3d 700, 701 (2d Dep't 2007) (citation omitted), when those interpretations are in the form of an opinion letter, they are only entitled respect to the extent that they are persuasive, *see Feldman v. CSX Transp., Inc.*, 31 A.D.3d 698, 705 (2d Dep't 2006) (citing *Christensen v. Harris County*, 529 U.S. 576, 587 [2000]) (other citation omitted).

> If a freshly laundered uniform is needed on each workday, then yes, "consistent with the average number of days per week worked by the employee" would mean equal to the average number of days worked.
>
> If an employer requires more frequent changes of uniform than once daily, "consistent with" would not mean equal to the average number of days worked and more uniforms would have to be provided.
>
> If the nature of the uniform, the work performed and the employer's standards do not require a freshly laundered uniform on each workday, and instead it is appropriate for the employee to wear the uniform more than once before washing, then "consistent with" would not mean equal to the average number of days worked and fewer uniforms could be provided.
>
> For example, if uniforms can generally be worn twice before washing, the employer can qualify for the wash-and-wear exception by providing a number of uniforms equal to at least half the average number of days worked by the employee.

*See* Dkt. No. 38-8, "Opinion Letter."

The natural inference drawn from the Opinion Letter is that the wash-and-wear exception is designed to require an employer to pay for an employee's uniform maintenance costs if the employee has to wash the total uniforms provided to them more than once per week.  The parties dispute how many times Plaintiff had to wash her uniform and whether she could always wear it more than once before washing.  Thus, to the extent that the Court considers this letter opinion, it does nothing more than create a factual dispute regarding the nature of Plaintiff's work and the number of shirts she would need in a given week.

Furthermore, Defendant's position assumes that analyzing how many shirts are "sufficient" is calculated at the *end* of an employee's employment.  For example, it is undisputed that, during Plaintiff's first week she worked four shifts, yet had only one shirt.  Thus, according to Defendant's position, had Plaintiff quit after her first week she would have been entitled to Uniform Maintenance Pay.  However, because she continued working, and at one point received another shirt, the exception suddenly applied.  The Opinion Letter does not support this position

but rather assumes that the employer would provide a sufficient quantity of uniforms each week from the day the employee is hired, rather than over the entire course of an employee's tenure.  In other words, whether an employer is required to remit Uniform Maintenance Pay to its employees should be determined on a weekly basis rather than at the end of the employee's employment.

Finally, the Court finds that this claim does not lend itself well to summary judgment because it is uniquely factual in nature.  For Defendant to prevail on this motion, it must prove that the undisputed facts show that it qualified for the wash-and-wear exception.  In this regard, the question is how many shirts are "sufficient" given the nature of Plaintiff's job and the number of shifts she worked each week; this question inherently involves a factual, as opposed to legal, dispute.

Therefore, the Court denies Defendant's motion for summary judgment regarding Plaintiff's Uniform Maintenance Pay claim because a material factual dispute exists regarding what constitutes a sufficient number of shirts Defendant must provide to Plaintiff to avoid its obligation to pay for her uniform maintenance costs.

### 3. Plaintiff's New York Human Rights Law claims

#### a. Hostile work environment claim

"'In order to establish a hostile work environment claim under [the NYHRL], a plaintiff must produce enough evidence to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'"  *Rivera v. Rochester*

- 14 -

*Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)[4] (quotation omitted).  In that regard,

a plaintiff must show both "'objective and subjective elements: the misconduct shown must be

"severe or pervasive enough to create an objectively hostile or abusive work environment," and

the victim must also subjectively perceive that environment to be abusive.'"  *Feingold v. New*

*York*, 366 F.3d 138, 150 (2d Cir. 2004) (quotation omitted).  Furthermore, when evaluating a

hostile work environment claim, courts "'examin[e] the totality of the circumstances, including:

the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the

victim's [job] performance.'"  *Rivera*, 743 F.3d at 20 (quoting *Hayut v. State Univ. of N.Y.*, 352

F.3d 733, 745 (2d Cir. 2003)).  "'As a general rule, incidents must be more than "episodic; they

must be sufficiently continuous and concerted in order to be deemed pervasive."'"  *Terry v.*

*Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Alfano*, 294 F.3d at 374 (quoting *Perry*, 115

F.3d at 149)).

> In *Terry*, the Second Circuit advised that,
>
> [w]hile the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'" . . . The environment need not be "unendurable" or "intolerable."  Nor must the victim's "psychological well-being" be damaged. . . . In short, "'the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.'" . . .

*Id.* (internal quotations omitted).

---

[4] Unlike the plaintiff in *Rivera* who raised both Title VII and NYHRL hostile work environment claims, Plaintiff only brings a hostile work environment claim pursuant to the NYHRL. However, the same standards apply to both claims.  *See Rivera*, 743 F.3d at 20 n.4 (citation omitted).

Furthermore, *Terry* explicitly instructed that a plaintiff need not show that each incident on its own was severe because "'a work environment may be actionable if the conduct there is *either* so severe *or* so pervasive as to alter the working conditions of a reasonable employee.'"  *Id*. at 149 (quoting *Richardson*, 180 F.3d at 440).  To that extent, the complained-of conduct need not "be both severe *and* pervasive to be actionable under a hostile work environment theory[.]"  *Id*.

With these standards in mind, Plaintiff proffers the following evidence to establish that the conduct about which she complains was objectively and subjectively pervasive or severe.[5]  Plaintiff testified that, on the first shift that she worked with Mr. Leeks, he told a co-worker that they were dating and at least once called her "hun."  *See* Dkt. No. 38-4, Pl's Depo. at 156, 161.  Plaintiff also testified that Mr. Leeks was "creepy" and that he was constantly staring at her and making her feel uncomfortable.  *See id.* at 162-64.

On the second shift, Plaintiff alleges that Mr. Leeks constantly said to her, "How you doing, baby girl?  How are you, hun?  Can I give you a ride, baby girl?  Hun, what's the matter?  You doing okay, Hun?  Baby girl, what's the matter?"  *See id.* at 168.  Furthermore, Plaintiff testified that Mr. Leeks inappropriately touched her hand twice.  *See id.* at 176.  Moreover, she stated that Mr. Leeks bumped into her on purpose.  *See id.* at 180.  Finally, she asserted that Mr. Leeks again stared at her constantly.  *See id.* at 181 (stating that it he looked like "a monster from the closet").

On the third shift, Plaintiff testified that Mr. Leeks constantly called her "baby girl."  *See* Pl's Depo. at 186.  Further, she stated that Mr. Leeks placed both hands on her shoulders and that she froze in fear and told him not to do that.  *See id.* at 200.  In addition, she stated that he was

---

[5] The Court draws the following factual summary primarily from Plaintiff's deposition testimony and presents it in the light most favorable to Plaintiff as the non-moving party.  *See Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006).

constantly staring at her. *See id.* at 203.  Moreover, she testified that, when she tried to hand Mr.

Leeks money, he grabbed her hand.  *See id.* at 204.  Finally, she testified that he bumped into her

again in the same manner as the previous shift.  *See id.* at 205.

On December 14, 2014, Mr. Leeks approached Plaintiff while she was working at her

full-time job at Rite-Aid.  Plaintiff testified that Mr. Leeks asked her to cook for him, asked her

to move away with him to Florida, rubbed her arm, and made her feel "completely terrified."  *See*

Pl's Depo. at 216.  Eventually Plaintiff ran away from Mr. Leeks and complained to her Rite-Aid

manager that she was "creeped out."  *See id.* at 229.

Although Defendant makes a cursory argument that Plaintiff "admitted that she did not

find this conduct[6] subjectively offensive or hostile when [it] occurred," *see* Dkt. No. 38-2 at 16,

it cannot be seriously disputed that Plaintiff subjectively perceived her work environment to be

hostile.  Buttressing her position is the written statement Plaintiff provided to the human

resources investigator explaining her concerns.  *See* Dkt. No. 38-15.  In any event, Plaintiff's

subjective perception largely involves a credibility determination, which is an inappropriate

conclusion for the Court to make when considering a motion for summary judgment.

It is a much closer call with regard to the objectively hostile nature of Plaintiff's work

environment.  As noted above, courts "'examin[e] the totality of the circumstances, including: the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the

---

[6] "[T]his conduct," refers to Mr. Leeks calling Plaintiff "hun" on the first shift they worked
together.  Admittedly, Plaintiff did state that, at first, she thought it was just his way of
welcoming her to the team.  *See* Pl's Depo. at 161.  However, the comments persisted; and she
eventually formed a subjective belief that her work environment was hostile.

victim's [job] performance,'" to determine whether an employee had to endure an objectively

hostile work environment.  *Feingold*, 366 F.3d at 150 (internal quotations and citation omitted).

On the one hand, the conduct about which Plaintiff complains only occurred during three

shifts and involved only one out-of-work incident.  Furthermore, each individual incident, on its

own, cannot be described as sufficiently severe to warrant a conclusion that Plaintiff endured a

hostile work environment.

On the other hand, the persistent and the continuous nature of Plaintiff's allegations that

Mr. Leeks was always staring and calling her "hun" and "baby girl" could reasonably be

considered "so pervasive as to alter the working conditions of a reasonable employee.'"  *Terry*,

336 F.3d at 149.  Furthermore, viewing the evidence in light most favorable to Plaintiff, her

complaints reveal that Mr. Leeks' conduct was "physically threatening" not merely "offensive."

*See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  The threatening nature of Mr. Leeks'

conduct materialized in Plaintiff's complaints that she had nightmares and was afraid of him.  *See*

Pl's Depo. at 19, 330; *see also* Dkt. No. 38-6, "Schroll Depo." at 24, 26 (acknowledging that

Plaintiff, on December 16, 2014, reported that she was not sleeping, had stress breakdowns, high

blood pressure, and nightmares).

Defendant cites a litany of cases in which the courts granted summary judgment for what

it describes as "far more egregious conduct than the instant case."  *See* Dkt. No. 38-2 at 18-19.

These cases, however, are easily distinguishable.  For example, in *Vito v. Bausch & Lomb Inc.*,

403 F. App'x 593 (2d Cir. 2010), the Second Circuit affirmed a summary judgment dismissal

where the plaintiff complained about one incident of inappropriate physical contact and several

gender-based crude jokes.  *See id.* at 596.  In this case, however, rather than crude sexual jokes,

the complained-of conduct includes intimidating staring, multiple instances of inappropriate

touching, and constantly being called "baby girl" and "hun."  Clearly, the complained-of conduct permeated Plaintiff's workplace more so than the conduct in the plaintiff's workplace in *Vito*.

Furthermore, in *Sardina v. United Parcel Serv., Inc.*, 254 F. App'x 108 (2d Cir. 2007) (summary order), the court found that the plaintiff's allegations of "a few off-color comments including references to 'office bitches' and 'Brooklyn bimbettes' by her supervisor and sexually suggestive comments by coworkers with whom she would tell sexual jokes" failed to rise to the level of an objectively severe work environment. *Id*. at 110.  Again, in this case, the complained-of conduct is not merely offensive jokes or comments; it also includes intimidating staring and offensive touching, which caused Plaintiff to feel so uncomfortable she complained after she worked only three shifts with Mr. Leeks.

Although "'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment,'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted), here, during each shift that Plaintiff worked with Mr. Leeks, she endured constant staring and inappropriate name-calling, multiple occasions of unsolicited touching, and was confronted outside of work with the same sexually intimidating behavior.  Therefore, viewing the evidence in the light most favorable to the non-moving party,  the Court finds that Plaintiff has offered sufficient evidence to permit a fact-finder to conclude that she suffered from a hostile work environment predicated on her sex.

The Court's analysis does not end there, however, as Plaintiff must be able to impute the conduct of Mr. Leeks, a co-worker, to her employer to maintain this claim.[7]  "Though

---

[7] Defendant asserts that, as an employer, it cannot be held liable for the actions of its employees unless it "either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it."  *See* Dkt. No. 38-2 at 20 (quoting *Quinn*, 159 F.3d at 766).  However, under

determination of whether a substantive sexual harassment violation has occurred is the same

under Title VII and the New York Human Rights law, the standards governing imputation of

liability to the employer differ."  *E.E.O.C. v. Rotary Corp.*, 297 F. Supp. 2d 643, 665 (N.D.N.Y.

2003) (citation omitted).  "Under New York law, in order to recover against an employer, the

complainant must demonstrate that the employer acquiesced in the discriminatory conduct or

subsequently condoned it[.]"  *In re Matter of Father Belle Cmty. Ctr. v. N.Y. State Div. of Human

Rights*, 221 A.D.2d 44, 53 (4th Dep't 1996) (citations omitted).  In this regard, condonation

"'contemplates a knowing, after-the-fact forgiveness or acceptance of an offense.  An employer's

calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct,

indicate condonation.'"  *Id*. (quoting *Matter of State Div. of Human Rights v. St. Elizabeth's

Hosp.*, [66 N.Y.2d 684,] 687) (other citation omitted).  "An employer may disprove this

condonation by a showing that 'the employer reasonably investigated a complaint of

---

New York law, the test for imputing liability to an employer is markedly different than the test
Defendant cited, which is used for Title VII claims.  *See In the Matter of Father Belle Cmty. Ctr.
v. N.Y. State Div. of Human Rights*, 221 A.D.2d 44, 51 (4th Dep't 1996) (citations omitted).
Admittedly, some courts have used the Title VII standard when addressing NYHRL claims
despite acknowledging the difference.  *See Perks v. Town of Huntington*, 251 F. Supp. 2d 1143,
1159 (E.D.N.Y. 2003) (stating that, "[g]iven . . . the longstanding practice of looking to Title VII
case law when interpreting the NYHRL, this Court applies the Supreme Court's framework to
[the plaintiff's] NYHRL claim as well as his Title VII claim" (footnote omitted)).

     This case, however, evokes this Court's diversity jurisdiction; and Plaintiff has not
brought Title VII claims against Defendant.  Furthermore, many courts have acknowledged that
the New York approach is more stringent than the Title VII test; meaning that, if Plaintiff's claim
passes the New York law test, it certainly can survive Title VII scrutiny.  *See Int'l Healthcare
Exch., Inc. v. Global Healthcare Exch.*, LLC, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007) (stating
that "courts have applied a stricter standard under the state and local human rights laws with
regard to the imputation of liability to an employer, requiring that the employer encourage,
condone, or approve of the conduct" (citations omitted)).  Therefore, the Court will consider
whether Mr. Leeks' conduct may be imputed to Defendant under New York law, rather than the
Title VII standard.

discriminatory conduct and took corrective action.'" *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F.

Supp. 2d 414, 433 (S.D.N.Y. 1998) (quotation omitted).

As an initial matter, the undisputed evidence shows that Defendant was actually aware of

Plaintiff's allegations because she complained directly to her manager, and the human resources

manager interviewed her. Thus, the remaining issue is whether Defendant's investigation of

Plaintiff's complaints was reasonable. In making this decision, the Court begins by reviewing

Defendant's policy and procedures relating to sexual harassment complaints.

Defendant's harassment policy "expressly prohibits any form of unlawful employee

harassment based on race, color, religion, gender, national origin, age, disability, genetics, or

veteran status." *See* Dkt. No. 38-10 at 2. Harassment, as defined in the policy, is

> [b]ehavior or conduct based on sex . . . and includes intimidation, insult, and
> ridicule where such conduct interferes with an individual's ability to perform his
> or her job, creates an intimidating, hostile, or offensive working environment, or
> adversely affects an individual's employment opportunities. The term
> "harassment" includes conduct of anyone in the workplace, supervisors,
> coworkers, or non-employees, who engage in verbally or physically harassing
> behavior that has the potential for humiliating or embarrassing another individual.

*See id.*

Sexual harassment, in turn, is defined as

> unwanted sexual attention of a persistent or offensive nature made by a person
> who knows, or reasonably should know, that such attention is unwanted. Sexual
> harassment includes sexually oriented conduct that is sufficiently pervasive *or*
> severe to unreasonably interfere with an employee's job performance or create an
> intimidating, hostile, or offensive working environment.

*See id.* at 3.

Furthermore, the policy states that sexual harassment encompasses a "wide range of conduct,"

for example, "[e]ngaging in sexually suggestive physical contact or touching another employee

in a way that is unwelcome." *See id.* Upon being informed of a complaint of sexual harassment,

human resources "will initiate a thorough investigation.  Following the completion of the investigation, the complainant will be advised of the closure of the investigation."  *See id*. at 5.

Plaintiff first complained to her supervisor, Mr. Morgan, on December 10, 2014. Immediately after he had spoken with Plaintiff, Mr. Morgan spoke with Ms. Schroll, the human resources manager.  Ms. Schroll advised Mr. Morgan that Plaintiff and Mr. Leeks should not be scheduled together and that she would interview Plaintiff on December 16, 2014.

In preparation for her meeting with Ms. Schroll, Plaintiff composed a written statement detailing some of her allegations against Mr. Leeks.  In her statement, she complained that Mr. Leeks "touched [her] arms and shoulders"; told others that they were dating; told her that she was the reason why he did not want to leave; said she should come with him when he does leave; called her "baby girl all the time"; went to her other place of work and "continued the same kind of stuff'"; tried to give her rides; and got jealous of her.  *See* Dkt. No. 38-15.  In sum, Plaintiff stated that she did not feel comfortable around him.  *See id*.

Ms. Schroll interviewed Plaintiff on December 16, 2014, after receiving Plaintiff's written statement.  During her deposition, Ms. Scholl stated that, before she spoke with Plaintiff, she only knew that she "felt uncomfortable."  *See* Dkt. No. 38-6, "Schroll Depo." at 17.  Ms. Schroll further testified that Plaintiff told her about how she felt uncomfortable around Mr. Leeks, that he touched her shoulder, that he called her "hun or baby girl a few times," that he joked that she was his girlfriend, and that he showed up at her other job.  *See id.* at 18.  Ms. Schroll also stated that Plaintiff told her that she had high blood pressure, stress breakdowns, and nightmares.  *See id*. at 24, 26.

After interviewing Plaintiff, Ms. Schroll interviewed Mr. Leeks and asked him whether he was aware of any complaints made against him and if he knew of any employees who had a

problem with him.  *See id.* at 29.  Ms. Schroll testified that Mr. Leeks admitted to touching other

people on the shoulder but in a joking manner.  *See id.* at 30.  Moreover, Mr. Leeks told Ms.

Schroll that he did not have any romantic feelings for any co-employees and that he was happily

married.  *See id.*  Finally, Mr. Leeks admitted to calling other employees "baby girl."  *See id*. at

33.

 Ms. Schroll, however, did not confront Mr. Leeks about his comment that he was dating

Plaintiff.  *See id.* at 31.  Nor did Ms. Schroll confront Mr. Mr. Leeks about his prior sexual

assault criminal conviction[8] or his previous discipline for sexual harassment.  *See id*. at 34.

 After her investigation, Ms. Schroll ultimately concluded that "[Plaintiff] felt

uncomfortable and it was best to schedule them not working together"; however, she determined

not to reprimand Mr. Leeks.  *See id.* at 21, 68.  Ms. Schroll further felt that that there was "no

overt sexual action" and that, therefore, Plaintiff's complaints boiled down to Mr. Leeks

annoying her to the point she felt uncomfortable.  *See id.* at 21.  Indeed, Ms. Schroll testified that

she did not interpret Plaintiff's complaint as a "sexual harassment complaint"; rather, she

"thought that there was a complaint about uncomfortableness."[9]  *See id.* at 59-60.

---

[8] Defendant argues that Mr. Leeks' previous criminal conviction is "irrelevant under Federal Rule 401 and should be barred under Rule 403, as its probative value is substantially outweighed by the danger of unfair prejudice[.]"  *See* Dkt. No. 47 at 9.  Defendant asserts that "Leeks' previous conviction cannot be used to show that he harassed Plaintiff 27 years later."  *See id.* at 10. Defendant misconstrues the relevance of the criminal conviction as related to this motion. Rather than being used to show that Mr. Leeks sexually harassed Plaintiff, Mr. Leeks' prior conviction is offered to show that Defendant completed an insufficient investigation into Plaintiff's sexual harassment complaint.  Furthermore, although it may be prejudicial, it is also highly probative of an important aspect of this case; and, therefore, the Court finds that Mr. Leeks' criminal conviction is admissible under Rule 403 for the limited purpose of proving that Defendant conducted an insufficient investigation.

[9] Mr. Morgan testified that he interpreted Plaintiff's allegations as a sexual harassment complaint. *See* Dkt. No. 38-7, "Morgan Depo." at 29-30.

Ms. Schroll testified that she never told Plaintiff that she found her complaints unsubstantiated, nor did she advise her of her right to appeal.  *See id.* at 56, 58.  Furthermore, Ms. Schroll testified that she did not review any previous complaints filed against Mr. Leeks, one of which in particular, stated that "[c]ontinued actions that create a hostile or unpleasant work environment will lead to termination."[10]  *See id.* at 71.

Viewing the foregoing in a light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that Defendant's investigation was cursory and failed to comply with its own internal guidance.

Specifically, with respect to the investigation, Ms. Schroll's testimony could reasonably show that she did not take Plaintiff's complaints seriously and only minimally confronted Mr. Leeks.  First, Ms. Schroll's testimony regarding what Plaintiff told her is internally inconsistent. For example, Ms. Schroll testified that Plaintiff only complained about feeling uncomfortable; however, the notes she took during the interview indicate that Plaintiff complained about physical manifestations of fear, including nightmares, high blood pressure, and stress attacks. Moreover, a jury could reasonably conclude that Ms. Schroll did not properly investigate Plaintiff's claim because she failed to consider the previous complaints against Mr. Leeks' and his previous criminal conviction.  In addition, Ms. Schroll never informed Plaintiff of the results of the investigation.  Moreover, it strains credulity to accept Ms. Scholl's testimony that she did not consider Plaintiff's allegations as constituting a sexual harassment complaint considering Defendant's own broad definition of sexual harassment.  *See* Dkt. No. 38-10 at 3.  Finally, Ms. Schroll never confronted Mr. Leeks regarding Plaintiff's complaint that he approached her at her

---

[10] This complaint apparently involved Mr. Leeks "growl[ing] at two different female co-workers."  *See* Dkt. No. 38-6, "Schroll Depo." at 71.

other job, tried to convince her to move away with him, and touched her arms multiple times. Ms. Schroll argues that she was trying to keep Plaintiff's identity secret because she did not want to expose her to any retaliation; however, a reasonable jury could conclude that, by doing so, she failed to address Plaintiff's complaint properly.[11]

In sum, the Court finds that triable issues of fact exist with regard to whether Plaintiff had to endure a hostile work environment and whether Defendant condoned such an environment by failing to investigate Plaintiff's complaints reasonably. Therefore, the Court denies Defendant's motion for summary judgment as to Plaintiff's NYHRL hostile work environment claim.

### b. Retaliation claim

New York Executive Law provides, in pertinent part, that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer . . . to discharge, expel or otherwise discriminate against any person because … she has opposed any practices forbidden under this article[.]" N.Y. Exec. Law § 296(e).

Courts use the three-part burden shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze NYHRL retaliation claims. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). Accordingly, "[f]irst, the plaintiff must establish a *prima facie* case of retaliation. If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).

---

[11] In any event, Defendant has an anti-retaliation policy; and Ms. Schroll advised Mr. Leeks that he was not to retaliate.

For a plaintiff to prove a prima facie case of retaliation, she must show "1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'"  *Zann Kwan*, 737 F.3d at 844 (quotation omitted).

Defendant contends that Plaintiff cannot show that it took an adverse employment action against her, nor that there is any causal connection between the alleged action and Plaintiff's complaints.  *See* Dkt. No. 38-2.

With respect to adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation omitted).

Defendant argues that not being scheduled cannot be considered an adverse employment action in this case because it was "a result of Plaintiff's own actions – her failure to provide Morgan with her availability to work, despite repeated requests for her availability."  *See* Dkt. No. 38-2 at 23.  Defendant similarly argues that Plaintiff's inaction caused her termination. Thus, because Defendant disregards the fact that Plaintiff was taken off the schedule and subsequently terminated, it argues that the only potential adverse employment action that she can allege is that she had to meet with Mr. Morgan in person to provide her availability.  *See id.*

Although Defendant's argument may be relevant to causation, it is irrelevant to determine whether Plaintiff suffered an adverse employment action.  It is undisputed that Plaintiff was no longer scheduled after she spoke with Ms. Schroll on December 16, 2014, and she was eventually terminated.  It is equally clear that being removed from the schedule and subsequently

terminated would dissuade a reasonable person from making a complaint.  Therefore, the Court finds that Plaintiff has established that she suffered an adverse employment action.

With respect to causation, a plaintiff may prove "[t]he causal connection . . . '"indirectly by showing that the protected activity was closely followed in time by the adverse action,"'" *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (quotation omitted), or, "'directly, through evidence of retaliatory animus directed against the plaintiff by the defendant,'" *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (quotation omitted).  In this case, the temporal proximity between Plaintiff's complaints and her subsequent removal from the schedule was nearly immediate, and she was terminated less than two months after she made her initial complaint.  Therefore, the Court finds that the temporal proximity between the adverse employment action and the protected activity establishes an inference of discrimination sufficient to satisfy Plaintiff's burden to prove a prima facie case of retaliation.

Having found that Plaintiff has alleged sufficient facts to establish a prima facie claim of retaliation, the Court must next consider whether Defendant has offered legitimate, non-retaliatory reasons for the adverse employment actions.  In this case, Defendant argues that it would have scheduled Plaintiff and she would have been allowed to continue working, however, she failed to give her Rite-Aid schedule to Mr. Morgan; thus, he was not able to place her on the schedule.  Furthermore, Ms. Schroll testified that Plaintiff was terminated automatically because she had been inactive in the system for a number of days.  *See* Dkt. No. 38-6, "Schroll Depo." at 41-42.  In this context, the Court finds that Defendant has met its burden to articulate legitimate, non-retaliatory reasons for leaving Plaintiff off the schedule and terminating her.

Whether Plaintiff can prevail on her claim, therefore, turns on whether she can demonstrate that Defendant's proffered reasons are mere pretext for discrimination.  In that vein,

a plaintiff must prove her retaliation claim "according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846 (footnote omitted). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.*

The parties offer strikingly different accounts of what transpired after Plaintiff's complaint. *Compare* Dkt. No. 38-1 at ¶¶ 47-53; *with* Dkt. No. 43-3 at ¶¶ 47-53. Defendant maintains that it would have scheduled Plaintiff if she had simply met with Mr. Morgan in person and provided her Rite-Aid schedule. Plaintiff, on the other hand, argues that Mr. Morgan and Ms. Schroll ignored her repeated attempts to contact them to place her on the schedule.

In support of her position, Plaintiff has proffered her phone records, which show various calls to Mr. Morgan and Ms. Schroll. Defendant argues that the calls are immaterial because they are "not contrary to the undisputed fact that Morgan and Plaintiff were unable to meet in person and decide on a schedule together." *See* Dkt. No. 47 at 13. Defendant's position misconstrues the importance of the phone-call evidence. The phone-call evidence could reasonably show that Plaintiff diligently attempted to contact Mr. Morgan but he ignored her. The many phone calls also add credibility to her position that she was trying to save her job yet was being disregarded. Indeed, she called Defendant's store and human resources department as late as January 26, 2015, only a few days before Defendant terminated her, purportedly for

"abandoning" her job.  Furthermore, Plaintiff has offered evidence that shows a strong temporal correlation between her complaints and her subsequent termination.  Finally, Mr. Morgan testified that he had never previously required Plaintiff to provide her Rite-Aid schedule before scheduling her.  *See* Dkt. No. 38-7, "Morgan Depo." at 35.

Defendant's only evidence is Ms. Schroll's and Mr. Morgan's testimony, both of whom stated that they would have scheduled Plaintiff if she had simply provided her availability in person.  Ms. Schroll further testified that she could not remember speaking with Plaintiff after she interviewed her regarding her complaints but that she would have told her to speak with Mr. Morgan.  *See* Dkt. No. 38-6, "Schroll Depo." at 51.  Mr. Morgan testified that he did not remember the content of his conversation with Plaintiff but that he would have told her, "Just show up, we'll put you on the schedule."  *See* Dkt. No. 38-7, "Morgan Depo." at 45.  Defendant's position is, therefore, premised exclusively on the credibility of its witnesses, which, standing alone, cannot support summary judgment.  *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) (stating that, "unless the defendants' proffered nondiscriminatory reason is 'dispositive and forecloses any issue of material fact,' summary judgment is inappropriate" (quoting *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000)) (other citation omitted).

In sum, determining whether Defendant retaliated against Plaintiff for complaining about sexual harassment is heavily fact dependent and requires making credibility assessments and weighing disputed evidence.  Therefore, the Court denies Defendant's motion for summary judgment with regard to Plaintiff's retaliation claim.

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

ORDERS that Defendant's motion to dismiss Plaintiff's Uniform Maintenance Pay claim for lack of subject matter jurisdiction, *see* Dkt. No. 18, is **DENIED**; and the Court further

ORDERS that Defendant's motion for summary judgment with regard to Plaintiff's Uniform Maintenance Pay claim and her NYHRL hostile work environment and retaliation claims, *see* Dkt. No. 38, is **DENIED**; and the Court further

ORDERS that this matter is referred to Magistrate Judge Peebles for all further pretrial matters, including, but not limited to, the issue of class certification.  Should the issue of class certification remain extant, and Plaintiff files a motion for class certification, the Court refers any such motion to Magistrate Judge Peebles for proposed findings of fact and recommendations for the disposition of said motion.

**IT IS SO ORDERED.**

Dated: May 18, 2017
     Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge

- 30 -